Case number 17-5410, United States of America v. Richard Paulus. Oral argument not to exceed 15 minutes per side. Mr. Lieberman for the appellate. Good morning. May it please the court. Dave Lieberman for the United States. I'd like to reserve three minutes for rebuttal. As this court's decision in the Persaud case counsels, a cardiologist's assessment of a blockage from an angiogram is a factual statement that can be proven false. And at trial here, the government presented ample evidence that the blockage findings recorded by Dr. Paulus were in fact false. And that Dr. Paulus did this as part of a fraudulent effort to bill Medicare, Medicaid, and other insurance companies for his costly stent procedures. The jury reasonably credited the government's proof. This court should now reinstate the jury's verdict. To my first point, page 384 of the Persaud decision where the court is discussing the false statement statute. That discussion makes clear that a blockage finding can constitute a false statement. It can be proven right or wrong. And in that case, the government presented testimony from qualified medical doctors with respect to each of the angiograms in that case. And this court held that the jury could reasonably credit that admissible expert testimony. In the government's view, the same conclusion holds here. For each patient file discussed at trial, Dr. Paulus recorded a severe level stenosis, 70, 80, 85. We called a qualified cardiologist as one of our experts who said he reviewed the angiogram, did not see a clinically significant blockage. It was 40% or lower except with respect to the one patient, patient DC, which we address in our briefs. The jury viewed the angiograms. They were admitted into evidence. The jury under this court's decision in Persaud was free to side with the government's expert. Submissible testimony, the jury could credit it. The district court erred by essentially taking this question of the fact from a jury and saying or holding that cardiac, the interpretation of an angiogram is simply a subjective enterprise. That was erroneous. We did, in fact, present ample evidence that the blockage findings were false. The jury could credit it. To the second basis of the district court's opinion, the district court criticized the government's case for failing to show evidence of fraudulent intent. In particular, the district court expressed concern that the government had not shown evidence of falsification of patient symptoms, falsification of records, upcoding, some of the features that were at issue in Persaud and some of the other cases that we cited to in our brief. Now, the government admits that would have been terrific smoking gun evidence of intent. But as this court has said, intent can be proven by circumstantial evidence. The district court even gave an instruction to the jury, state of mind may be proven indirectly from surrounding circumstances. That's instruction number 15. What did we present on intent? We presented a stark disparity in Dr. Paulos' blockage assessments across a large number of cases. And the Fourth Circuit said in the McLean case that is direct evidence of fraud. We had more patient files at issue in that case, in this case than at McLean. One of those are doctors, Dr. Morrison, the Anthem consulting cardiologist. He received random samples from the insurance company and testified that he found over half problematic. That it was inflated, he didn't see it, and it could not be justified by inter-observer variability. We had five doctors who worked with Paulos or interacted with him who provided anecdotal testimony that throughout their practice, they observed inflated stenosis findings that they did not see upon observing the same angiogram. Combine that with, it's circumstantial, but again, the peer comparison data as we put forward in McLean, the aberrant billing rates. Dr. Paulos billed $1.1 billion to Medicare between 2006 and 2013, placing him as the number one biller of Medicaid during those years. His procedure rates were enormously high. He was outpacing the entire cardiology departments of other hospitals. And he had a $2.5 million salary, again, multiple degrees higher than the average cardiologist. All occurring, as the jury heard, at a time when the hospital was pushing to increase its cardiology practice, to push more procedures through the catheterization labs. And Dr. Paulos was their top producer. He was meeting weekly with the hospital CEO. So line up those points, and the jury had ample basis by which to find that Dr. Paulos had fraudulent intent. Turning to the motion for new trial, we think that this issue is, in fact, before the court. As we explained in our briefs, if the government's proof was sufficient at the close of our case, then the testimony that Dr. Paulos put on, which are character witnesses, another expert, and his testimony himself, that's weighing, that's witness versus witness, that doesn't come into play on the sufficiency question, that cannot disrupt the sufficiency of the government's proof that we presented during our half of the case. And so if this court agrees with the government that our evidence was sufficient at the close of our case, all remaining sufficiency issues are moot. But the new trial motion goes to the weight of the evidence. That's correct, Your Honor. That's a different issue than sufficiency. And here, Judge Bunning also granted the motion for new trial, but solely on the basis that the reading of the angiograms was not objective, but totally subjective, and therefore opinion rather than fact. I mean, that's the only basis he gave, right? He also briefly discussed his finding that there was not sufficient evidence of intent, so two bases. Okay. I mean, would it not be more prudent for us to remand the new trial issue to Judge Bunning for determination under the correct standards of weighing the evidence? That is certainly within the court's province to do. We don't think that it's appropriate, given that upon reviewing the post-trial motions, Judge Bunning ruled on every claim advanced by the defense post-trial. And he granted on two bases. Angiograms are subjective, and we think that that ground is just not available after Persaud. And the district court also granted on the basis that we didn't have evidence of fraud, and for the reasons that I just explained, yes, we didn't have the smoking gun evidence, but under this court's decisions, we had ample evidence tracking some of the evidence in Persaud, the evidence in McLean, the evidence in Patel. Is it clear that he weighted? Okay, those are the two bases that he granted, but there could be another basis that the weight of the evidence for the government is so insufficient that as the 13th juror, the judge would have ruled the other way, and therefore a new trial is necessary. I mean, the fact that the two bases are erroneous doesn't exclude all other bases that were argued, do they? I mean, the problem I have is Judge Bunning didn't rule on everything. So the government takes the view that he did, in fact, rule on all the specific claims that the defense advanced as a basis for a new trial. If the court disagrees, it would be completely appropriate for it to remand for Judge Bunning to further review. He considered all the grounds for a new trial that were advanced below? Yes. The court had an extensive oral argument where— I just don't see any ruling on the other. The ruling here is like one paragraph, I think. Well, the district court actually rejects in quite detail some of the evidentiary objections, some of the prosecutorial misconduct objections. There were other grounds that were discussed during the oral argument. We view the district court's order as resolving everything, but if this court disagrees, it is perfectly appropriate to remand and we can have further argument on the motion for a new trial. Unless there are any additional questions about the government's position, I would like to reserve the remainder of time for rebuttal. Thank you. Good morning, Your Honors. Robert Bennett on behalf of Dr. Paulus. The district court found that the government's case was, quote, a house of cards that fell apart when subjected to legal review for sufficiency of evidence. And as you know, Judge Bunning is not one to make rulings like that. If you examine his rulings in hundreds, if not thousands of cases. Well, he had his own feeling about the subjectivity of these predictions that doctors make and that philosophy he had seems to be squarely rejected by Persaud. So I don't see how you win on that. Well, I'll tell you how I think we should win on that, if Your Honor please. We think Persaud, which two members of this panel were on, is clearly different. First of all, as different from Persaud, we made a significant attack on angiograms and we presented a tremendous amount of evidence before the court that angiograms don't lend themselves to objective determinations, but they're all over the place. And the evidence in this case shows just that. You want us to say that as a matter of law that you can't have fraudulent intent in how you read an angiogram and when you view it at that level, Persaud rejects that analysis. Now, how good your proofs were here, you presented that to the jury and the jury didn't buy it. Well, first of all, Your Honor, you've got to remember that we showed in this case that the angiograms that were presented by the government and relied on by the government were not the same films that were seen in the lab. And that we presented an expert from the Cincinnati Children's Hospital who said they were seriously deteriorated and they were significantly different from what Dr. Paulus saw in the lab. And we think that violates a very basic rule whether you want to go off on a Daubert basis or a federal rule of evidence basis. The fact is the overwhelming evidence in this case was that the angiograms relied on by the government were different from what Dr. Paulus saw in the lab. And in fact, the government stipulated to that. They stipulated that the angiograms which were viewed by the jury were not those viewed by Dr. Paulus in the cath lab. The same angiograms, they're just displayed with different resolution. That's not correct, Your Honor. A whole different image? No, it's not a whole different, but the number of pixels which are the dots which like on your TV would show. That's what resolution means. Okay, there are a third of those approximately. It's the same angiogram, it's just depicted in this using your words with fewer pixels. And the shading is different? Another witness said close enough. Another expert witness, your witness said they're different, you can't use those. And the government witness said no, they're close enough. Well, I'd respectfully submit in the criminal case. Is there a corresponding government witness that said they were close enough for the purposes of this case? Well, they had a Dr. Semai who it's not clear if he even looked at the angiograms in this case. And I don't think there is a corresponding witness of the qualification as Dr. Strauss. He examined all of the equipment, he said he found the differences to be significant. Significant, he said. This is not just, and again, it's a criminal case, which by the way, if you read the whole transcript, it appears they really prosecuted a civil case much more so than a criminal case. But going back, if I may, Your Honor, to Prasad. In Prasad, Your Honor's found, and this is why it's distinguishable from this case, that there were altered records, that there was an evasion of subpoenas, that there was a recruitment of patients, that there was billing for FANA procedures, that there were falsified symptoms in medical records, that no patients testified in support of Prasad, the expert witnesses were weak, I would suggest ours were powerful, evidence of useless add-on procedures. I could go on and on. Those factors are not present in our case. They're clearly different. What is the difference with respect to the holding in Prasad that says that, as opposed to this being a matter of subjective opinion, the readings of these angiograms result in facts, and the facts can be shown to be false, the facts can be shown to be true? You're right that Prasad has other elements in it that probably go to the weight of the evidence in that particular case, but I don't see why those differences go to the fundamental premise of Prasad. Well, I think the difference is that in Prasad, first of all, there was no challenge, as far as I recall, to the quality of the angiograms. I seriously doubt this Court would have ruled the same way if you had evidence before you, like Judge Bunning had, that the angiograms were not what Dr. Paulus saw and were significantly different.  Is the basis of Judge Bunning's ruling that the angiograms were different, or is his ruling broader, that angiograms in itself cannot be objectively different? I really think it's the latter, especially where, as in his case, there was a challenge. I thought it was a broader holding, too, that he just says angiograms themselves cannot be objectively read, and it doesn't matter. I don't think it's clear exactly, but I think he would be more leaning that way. In the time available, there's one other issue I would like to... You look at the angiogram, it looks a lot like an x-ray to me. I could see the same argument made about x-rays, that radiologists interpret x-rays differently. You get three different radiologists, and you're going to have some different interpretations, but why are the angiograms different than x-rays? I mean, it looks like you've got concrete picture evidence here that people have to analyze and look at and measure and stuff. Well, I think in either case, Judge, I think if you establish that there's a great deal of variability among experts as to what that x-ray shows, or as to what an angiogram shows, then I think that totally undercuts the idea that there is some objective thing about... It really is no dispute that x-rays are admissible evidence, and that that is objective evidence, though it's subject to different opinions. Well, x-rays are not quite as sophisticated. I don't know what's so sophisticated here. They're measuring the narrowness of the arteries, and it is a picture, and they're measuring how narrow they are. But, Your Honor, with all due respect to you, it's much more than that in an angiogram. If there's a lessening, we have evidence before Judge Bunning that just a change of a couple of pixels can change the evidence, can change the image. The location of the obstruction can be significantly different. We've presented a tremendous amount of evidence which attacks the notion that you can make an objective finding on just angiograms, and whereas here they're not the same and are significantly different, it's all the more true. If I may, Your Honor, I'd like to raise one other point that I think is very, very important. The government pulled a real bait-and-switch on Judge Bunning, if I may use that term. They argued that the Kentucky Medical Board settlement should be admitted because it sort of was part of the operative facts. I think they used the term chronology. And on that representation, Judge Bunning let it in. And then the government, and it shouldn't have been admitted, it's a settlement, it fits the rules of a settlement agreement, and it shouldn't have been admitted. But once they got it in, the government used it as an unfair prejudicial sword. Let me give you an example. In their opening statement, the government said, Mr. Marshall will tell you about the Medical Board's investigation. He will tell you that the defendant entered into an agreed order to retire in lieu of having his license revoked. They went on to say to a number of witnesses, a number of them, Dr. Ragosta, just a few more questions. Have you ever had your medical license retired in lieu of revocation by the State Board? Final question. This was to Mr. Mussetter asked you about different letters. Let me ask you this, have you ever had your license suspended by the Kentucky Medical Board? And on and on, there were 10 or 15 or 20 examples where they made the implication that the Medical Board had made a finding against him. Now, what they are talking about, and this is somewhat subtle, the Kentucky Medical Board has a provision in its settlement agreements which is a self-enforcing mechanism. If a doctor enters into an agreement with them that he won't practice for a period of time, there's a provision in there that says if he violates that in practices, he acknowledges in advance that he's a danger to the community. And that was devastating to us at trial, absolutely devastating to us. It should never have been admitted into evidence. Now, going back to the angiograms and Prasad, I asked the Court to look at all the testimony regarding those angiograms. The government expert acknowledged that it is very difficult to establish stenosis, that it involves opinion. Not objective fact, it involves opinion. Dr. Rogosta in his own book, which we brought to the attention of the Court, said that. Dr. Molitoro said that. We have one study we submitted, which I forget the name of, where four experts looked at angiograms and looked at the same, not ones that were degraded like in this case. Two of them found no blockages, and one found 100 percent blockage, and one found a 90 percent blockage. I respectfully submit that Judges McKeague and Judge Griffin, you didn't have that before you. In fact, if I remember correctly, one of you raised the question somewhere in there of competency of counsel. They didn't attack it. They didn't raise it. We did. And I think if you look at it, at what's in that record, you'll see that there is just no fair way to say there is some objective thing there. Doctors are all that applies. There's one other point that I want to make on this. You criticized in Persaud how patients got there. You know, he would send people out. I'll finish. All of these patients that Dr. Pauls treated, they came from emergency rooms, they came because they were prior patients or other doctors. Every single one of them, they were all in distress. They were not stable patients, which the guidelines apply to. They were unstable patients, which the guidelines don't apply to. And again, this is a criminal case. It's not a civil case. The guidelines have no business in this case. Thank you. Thank you, counsel. Briefly responding to two questions from the court. Judge Griffin, on x-rays, we actually had Dr. Argosa testifying. Documentary 204-5188, the interpretation of an angiogram stands alone, just like a radiologist reads an x-ray. That was the comparison. To Judge McKeague on the evidence regarding the patient angiograms. The government had seven cardiologists, fact cardiologists, testify that the angiograms, archived angiograms that they saw were of diagnostic quality, meaning that they could accurately assess a blockage on them. A number of those doctors had worked previously at King's Daughters and would presumably be familiar, intimately familiar with that system. Our expert also testified that the archiving changes referenced by opposing counsel would not affect 99 percent of angiograms, and in the remaining 1 percent it would be very different, it would be very small, and a 70 percent blockage would not drop to a 50 percent blockage. That was the testimony on that. Two points in response to Mr. Bennett. The medical board settlement, there was no objection to that introduction at trial. Docket entry 195, page ID 4265, no objection to its submission. Had there been a motion in limine about that earlier? There was not. There was a pretrial motion to strike reference to the settlement in the indictment, which the district court denied. There was no motion in limine, and even under this court's long-established practice, the defense would still have to contemporaneously object at trial to avoid plain error review. The government has explained why we think it's admissible under 408. These were stipulated statements by Dr. Paulus, and in any event the district court, in its order, said post-trial there was no substantial prejudice to Dr. Paulus. Two main points, summing up the government's view. Prasad is the same. Dr. Prasad challenged on page 31 of his brief to this court the government's use of angiograms to prove falsity. He argued that the government could not prove falsity because angiogram interpretation resulted in systematic errors. That was the quote, systematic errors on blockages. That's almost identical to the claim that Dr. Paulus raises now. The government cannot provide proof of falsity because angiograms are just subjective. We think Prasad resolves that completely. On the last point, Mr. Bennett says that angiograms are all over the map.  Well, that was also not the testimony from one of Dr. Paulus' cardiologists. Dr. Preston, if it's less than 40%, we can all agree on that. And if it's more than 70%, we can all agree on that. It is in the middle where it gets a bit different. 231, page ID 7306. That 40-70 boundary, that was the way that the government structured its proof in this case. The jury had every reasonable ground to side with our view, our experts, and convict Dr. Paulus of the charged offenses. For these reasons, we'd ask that the court reverse. Thank you, counsel.